## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | |
|---|---|
| | ) No. |
| BILL BURGRAFF, Individually and on Behalf of All Others Similarly Situated, | ) |
| | ) CLASS ACTION |
| | ) |
| Plaintiff, | ) COMPLAINT FOR VIOLATIONS |
| | ) OF THE FEDERAL SECURITIES |
| v. | ) LAWS |
| | ) |
| GREEN BANKSHARES, INC., JAMES E. ADAMS, STEPHEN M. ROWND, and R. STAN PUCKETT, | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) DEMAND FOR JURY TRIAL |
| | ) |

Plaintiff Bill Burgraff, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Green Bankshares, Inc. ("GRNB" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports disseminated by Green; and (c) review of other publicly available information concerning GRNB.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of purchasers of GRNB's securities between January 19, 2010, and November 9, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      GRNB operates as the bank holding company for GreenBank (the "Bank"), which provides commercial banking services primarily in Tennessee. The Bank offers a range of deposit products and it also provides a portfolio of loan products, including commercial real estate loans; residential real estate loans, such as one-to-four family, owner-occupied residential mortgage loans; commercial loans for various business purposes, including working capital, inventory and equipment, and capital expansion; and consumer loans for personal, family, or household purposes.

3.      On October 20, 2010, GRNB announced its financial results for the Company's 2010 fiscal third quarter and disclosed that the Company's net charge-offs increased on a sequential basis to $36.5 million from $4.9 million in the prior quarter. Moreover, the Company indicated that it had engaged an independent third-party loan reviewer, which contributed to the asset quality-impact reflected in its third quarter results.

4.      On this news, shares of GRNB declined $2.79 per share, more than 43%, to close on October 21, 2010, at $3.68 per share, on unusually heavy volume.

5.      Thereafter, on November 9, 2010, after the market closed, the Company further announced that in consultation with the Federal Reserve Bank of Atlanta, the Company had given notice to the U.S. Treasury Department that the Company was suspending the payment of regular quarterly cash dividends on the Company's Fixed Rate Cumulative Perpetual Preferred Stock, Series A, issued to the U.S. Treasury Department. Further, the Company disclosed that "two large relationships totaling approximately $31.4 million, after charge-offs of $20.7 million," had defaulted during the third quarter. According to the Company "these borrowers had been paying interest only and were current but new appraisals ordered during the quarter showed collateral shortfalls that caused the Company to move these relationships to non-accrual and charge them down to the

collateral values."

6.     On this news, shares of GRNB declined $1.08 per share, more than 29.5%, to close on November 10, 2010, at $2.57 per share, on unusually heavy volume.

7.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was overvaluing the collateral of certain loans above appropriate market values; (2) that, as such, the Company was failing to timely take impairment charges to reduce the carrying values of certain loans to the appropriate market values; (3) that the Company lacked adequate internal and financial controls; and (4) that, as such, the Company's financial results were materially false and misleading at all relevant times.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9.     The claims asserted herein arise under Sections 10(b) 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).   Substantial acts in furtherance of the alleged fraud

or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District. Additionally, GRNB maintains its principal executive offices within this Judicial District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

13. Plaintiff Bill Burgraff, as set forth in the accompanying certification, incorporated by reference herein, purchased Green securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant GRNB is a Tennessee corporation with its principal executive offices located at 100 North Main Street, Greeneville, Tennessee, 37743.

15. Defendant James E. Adams ("Adams") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of GRNB.

16. Defendant Stephen M. Rownd ("Rownd") was, at all relevant times, Chairman of the Board and Chief Executive Officer ("CEO") of GRNB since March 31, 2010.

17. Defendant R. Stan Puckett ("Puckett") was, at all relevant times, Chairman of the Board and CEO of GRNB until his retirement on March 31, 2010.

18. Defendants Rownd, Adams and Puckett are collectively referred to hereinafter as the

"Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Green's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     GRNB operates as the bank holding company for GreenBank (or the "Bank"), which provides commercial banking services primarily in Tennessee. The Bank offers a range of deposit products and it also provides a portfolio of loan products, including commercial real estate loans; residential real estate loans, such as one-to-four family, owner-occupied residential mortgage loans; commercial loans for various business purposes, including working capital, inventory and equipment, and capital expansion; and consumer loans for personal, family, or household purposes.

### Materially False and Misleading
### Statements Issued During the Class Period

20.     The Class Period begins on January 19, 2010.  On this day, the Company issued a

press release entitled, "GREEN BANKSHARES REPORTS FOURTH QUARTER RESULTS."

Therein, the Company, in relevant part, stated:

> GREENEVILLE, Tenn. (January 19, 2010) – Green Bankshares, Inc.
> (NASDAQ:GRNB), the holding company for GreenBank, today reported a net loss
> available to common shareholders for the fourth quarter of 2009 of $76,000
> compared with a net loss for the third quarter of 2009 of $7.7 million and a net loss
> of $15.3 million for the fourth quarter of 2008.  On a diluted per share basis, the net
> loss for the fourth quarter of 2009 was $0.01 compared with a net loss of $0.59 for
> the third quarter of 2009 and a net loss of $1.18 for the year-earlier quarter.
> Excluding preferred stock dividends paid and accretion of discount on common stock
> warrants issued to the U.S. Treasury, the Company reported net income of $1.2
> million for the fourth quarter of 2009 compared with a net loss of $6.5 million for the
> third quarter of 2009 and a net loss of $15.2 million for the fourth quarter of 2008 .
> . .
>
> *          *          *
>
> For the year ended December 31, 2009, the Company reported a net loss available to
> common shareholders of $155.7 million or $11.91 per diluted share, which was
> affected significantly by an after-tax, non-recurring, non-cash goodwill impairment
> charge of $137.4 million or $10.51 per diluted share recorded in the second quarter
> of 2009. Excluding the goodwill impairment charge, the Company's net operating
> loss for 2009 was $18.3 million or $1.40 per diluted share versus net income of $5.5
> million or $0.42 per diluted share for the year ended December 31, 2008 . . . .
>
> Stan Puckett, Chairman and Chief Executive Officer, commented, "Although the
> economic climate in which we operate remains under considerable pressure, we were
> pleased to see stabilization in several areas of our business as 2009 came to an end.
> While NPAs remain elevated, we believe that the credit cycle crested in 2009 and
> credit costs now have begun to moderate, as seen by lower net loan charge-offs and
> OREO costs.  Also, lower funding costs have continued to drive improvements in net
> interest income and net interest margin.  Although we are cautiously optimistic about
> these positive developments, we will continue to work aggressively to identify and
> address problem loans in 2010 and build on the trends that are now emerging in our
> business."
>
> *          *          *
>
> Non-interest income totaled $8.1 million for the three months ended December 31,

2009, down from $9.2 million for the third quarter of 2009 and $10.2 million in the year-earlier quarter. The sequential quarter decline primarily reflected lower other income relating to non-recurring items totaling $468,000 associated with insurance proceeds received and a gain on the sale of undeveloped land adjacent to a branch facility, service charges on deposit accounts, and securities gains, while the year-over-year quarterly decline was due primarily to lower securities gains. For the year, non-interest income declined to $31.6 million from $33.6 million in 2008, primarily due to lower securities gains, including other than temporary impairment charges, which were offset to some extent by higher service charges. The ongoing success of GreenBank's High Performance Checking product added 15,810 net new checking account customers during the year, for a new account opening ratio of 2.18 new accounts opened for each account closed and increasing deposit service charge revenues by $562,000.

Non-interest expense totaled $20.5 million for the fourth quarter ended December 31, 2009, compared with $22.4 million for the third quarter of 2009 and $24.2 million for the fourth quarter of 2008. The decline in non-interest expense of $1.9 million or 8% from the third quarter was principally due to lower losses on OREO, while the year-over-year quarterly decline reflected lower OREO losses offset somewhat by higher FDIC insurance. Non-interest expense for 2009 totaled $229.6 million, including a one-time, non-cash goodwill impairment charge of $143.4 million. Excluding this impairment charge, non-interest expense for 2009 was $86.2 million, up $361,000 or less than 1% from 2008 . . . .

21.     On February 25, 2010, GRNB filed its Annual Report on Form 10-K with the SEC for the 2009 fiscal year.  The Company's Form 10-K was signed by Defendant Puckett, and reaffirmed the Company's financial results previously announced on January 19, 2010.  The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Puckett and Adams, who certified:

1.     I have reviewed this quarterly report on Form 10-K of Green Bankshares, Inc. (the "registrant");

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial

information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrants other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a 15(e) and 15d 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the

design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

22.     The Company's Form 10-K filed with the SEC on February 25, 2010, in relevant part, stated:

Provision for Loan Losses. Management assesses the adequacy of the allowance for loan losses by considering a combination of regulatory and credit risk criteria. The entire loan portfolio is graded and potential loss factors are assigned accordingly. The potential loss factors for impaired loans are assigned based on independent valuations of underlying collateral and management's judgment. The potential loss factors associated with unimpaired loans are based on a combination of both internal and industry net loss experience, as well as management's review of trends within the portfolio and related industries.

Generally, commercial real estate, residential real estate and commercial loans are assigned a level of risk at inception. Thereafter, these loans are reviewed on an ongoing basis. The review includes loan payment and collateral status, borrowers' financial data and borrowers' internal operating factors such as cash flows, operating income, liquidity, leverage and loan documentation, and any significant change can result in an increase or decrease in the loan's assigned risk grade. Aggregate dollar volume by risk grade is monitored on an ongoing basis. The establishment of and any changes to risk grades for consumer loans are generally based upon payment performance.

The Bank's loan loss allowance is increased or decreased based on management's assessment of the overall risk of its loan portfolio. Occasionally, a portion of the allowance may be allocated to a specific loan to reflect unusual circumstances associated with that loan.

Management reviews certain key loan quality indicators on a monthly basis, including current economic conditions, historical charge-offs, delinquency trends and ratios, portfolio mix changes and other information management deems necessary. This review process provides a degree of objective measurement that is used in conjunction with periodic internal evaluations. To the extent that this process yields differences between estimated and actual observed losses, adjustments are made to

provisions and/or the level of the allowance for loan losses.

Increases and decreases in the allowance for loan losses due to changes in the measurement of impaired loans are reviewed monthly given the current economic environment. To the extent that impairment is deemed probable, an adjustment is reflected in the provision for loan losses, if necessary, to reflect the losses inherent in the loan portfolio. Loans continue to be classified as impaired unless payments are brought fully current and satisfactory performance is observed for a period of at least six months and management further considers the collection of scheduled interest and principal to be probable.

The Company's provision for loan losses decreased slightly for the year 2009 by $2,564 to $50,246 from $52,810 in 2008 while the total loan loss reserve increased from $48,811 at December 31, 2008 to $50,161 at December 31, 2009. In 2009, net charge-offs were $48,896 compared with net charge-offs of $38,110 in 2008. Management continually evaluates the existing portfolio in light of loan concentrations, current general economic conditions and economic trends. Beginning in the fourth quarter of 2009, on a monthly basis, the Company undertakes an extensive review of every loan in excess of $1 million that is adversely risk graded. Prior to the fourth quarter of 2009 this review had been performed during the final month of each quarter. Throughout 2009 and as a result of this review process, the Company ordered new appraisals of adversely graded real estate secured loans and, following receipt of those appraisals, began aggressively charging off collateral shortfalls/balances as appropriate. Appraisals received by the Company during the second quarter of 2009 on existing OREO and targeted loans reflected significant deterioration in the value of the underlying properties, which along with the deterioration of previously performing relationships, triggered increased charge-offs during this quarter and continued into the third quarter of 2009. Management believes that the economic slowdown in the Company's markets occurred throughout 2008 and most of 2009 with beginning signs of economic stabilization in Tennessee occurring late in 2009. Based on its evaluation of the allowance for loan loss calculation and review of the loan portfolio, management believes the allowance for loan losses is adequate at December 31, 2009. However, the provision for loan losses could further increase throughout 2010 if the general economic trends begin to reverse and conditions continue to weaken or the residential real estate markets in Nashville or Knoxville or the financial conditions of borrowers deteriorate beyond management's current expectations.

The ratio of nonperforming assets to total assets was 5.07% at December 31, 2009 and 2.61% at December 31, 2008 reflecting not only the recessionary environment but also the rise in non-performing asset levels combined with a shrinking Balance Sheet. Total nonperforming assets increased to $132,726 in 2009 from $76,806 at year-end 2008. Nonaccrual loans, included in non-performing assets, increased to

$75,411 at December 31, 2009 from $30,926 at December 31, 2008. Further reflecting the economic downturn, OREO and repossessed assets increased from $45,371 at the end of 2008 to $57,168 at year-end 2009. Management believes that, based upon recent appraisals, these assets have been appropriately written down and they do not anticipate any material losses, based on current economic conditions. Total impaired loans, which include substandard loans as well as nonaccrual loans, increased from $47,215 at December 31, 2008 to $115,238 at December 31, 2009. The Company records a risk allocation allowance for loan losses on impaired loans where the risk of loss is deemed to be probable and the amount can be reasonably estimated. Further, the Company specifically records additional allowance amounts for individual loans when the circumstances so warrant. For further discussion of nonperforming assets as it relates to foreclosed real estate and impaired loans, see "ITEM 1. Business — Lending Activities — Past Due, Special Mention, Classified and Nonaccrual Loans" located above.

To further manage its credit risk on loans, the Company maintains a "watch list" of loans that, although currently performing, have characteristics that require closer supervision by management. At December 31, 2009, the Company had indentified approximately $212,288 in loans that were placed on its "watch list" compared to $182,984 as of December 31, 2008. If, and when, conditions are identified that would require additional loan loss reserves to be established due to potential losses inherent in these loans, action would then be taken.

*        *        *

Past Due, Special Mention, Classified and Nonaccrual Loans. The Company classifies its loans of concern into three categories: past due loans, special mention loans and classified loans (both accruing and non-accruing interest).

***When management determines that a loan is no longer performing and that collection of interest appears doubtful, the loan is placed on nonaccrual status. All loans that are 90 days past due are considered nonaccrual unless they are adequately secured and there is reasonable assurance of full collection of principal and interest. Management closely monitors all loans that are contractually 90 days past due, treated as "special mention" or otherwise classified or on nonaccrual status. Nonaccrual loans that are 120 days past due without assurance of repayment are charged off against the allowance for loan losses.***

The Company may elect to formally restructure a loan due to the weakening credit status of a borrower so that the restructuring may facilitate a repayment plan that minimizes the potential losses that the Company may have to otherwise incur. At December 31, 2009, the Company had $16,061 of restructured loans of which $4,429 was classified as non-accrual and the remaining were performing. There were no

restructured loans at December 31, 2008.

(Emphasis added).

23.    On April 21, 2010, the Company issued a press release entitled, "Green Bankshares Posts First Quarter Earnings of $1.9 Million." Therein, the Company, in relevant part, stated:

GREENEVILLE, Tenn.--(BUSINESS WIRE)-- Green Bankshares, Inc. (NASDAQ:GRNB), the holding company for GreenBank, today reported net income available to common shareholders of $1,946,000 for the first quarter of 2010 compared with a net loss available to common shareholders of $76,000 for the fourth quarter of 2009 and net income available to common shareholders of $3,548,000 in the year-earlier quarter. Net income available to common shareholders was $0.15 per diluted share compared with a net loss of $0.01 per diluted share for the fourth quarter of 2009 and net income of $0.27 per diluted share in the first quarter of 2009.

Excluding preferred stock dividends paid and the accretion of discount on common stock warrants issued to the U.S. Treasury, the Company reported net income of $3,196,000 for the first quarter of 2010 compared with net income of $1,174,000 for the fourth quarter of 2009 and $4,780,000 in the year-earlier quarter.

\*        \*        \*

Stephen M. Rownd, newly appointed Chairman and Chief Executive Officer, commented, "The solid underpinnings of our company's core earnings potential are beginning to become more evident as we emerge from this recessionary cycle. After having recently visited with our management and bankers in all three of our operating regions, I am impressed by the caliber of our team and their drive and determination to move GreenBank forward in these challenging times. I am cautiously optimistic that with the further hard work and dedication of our employees and management, we will continue to make further strides in improving the Company's performance as this year continues to unfold."

\*        \*        \*

Non-interest income totaled approximately $7.7 million for the first quarter of 2010 compared with $8.1 million on a linked quarter basis and $6.9 million for the first quarter of 2009. Non-interest income for the fourth quarter of 2009 included approximately $238,000 of net securities gains. Deposit service charges increased $584,000 from first quarter 2009 levels due to the continued success of the Company's High Performance Checking product and its strong attraction to new customers. The decline in deposit service charges from the fourth quarter of 2009

reflected historical seasonal patterns relating to the impact of income tax refunds on customer account balances.

Non-interest expenses totaled approximately $20.5 million in the first quarter of 2010 and were relatively flat compared with the fourth quarter of 2009 despite FICA and other employment tax increases that seasonally impact non-interest expense levels. The temporary increases associated with payroll taxes were partially offset by a reduction of $642,000 in losses incurred on the disposition of OREO properties versus the fourth quarter of 2009. Compared with the first quarter of 2009, non-interest expenses increased $2.7 million or 15%. Although payroll-related costs declined approximately $345,000, this decrease was more than offset by higher product advertising costs of $534,000, increased losses on the disposition of OREO property of $428,000, and elevated collection and repossession costs of almost $990,000.

24.     On May 7, 2010, Green filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal first quarter.  The Company's Form 10-Q was signed by Defendant Adams and reaffirmed the Company's financial results previously announced on April 21, 2010.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants Rownd and Adams, substantially similar to the certifications contained in ¶21, *supra*.

25.     The Company's Form 10-Q filed with the SEC on May 7, 2010, in relevant part, stated:

Provision for Loan Losses. During the three months ended March 31, 2010, loan charge-offs were $4,733 and recoveries of charged-off loans were $850. The Company's provision for loan losses increased to $3,889 for the three months ended March 31, 2010, as compared to $985 for the same period in 2009. Compared with the fourth quarter of 2009, the provision for loan losses declined by $2,513 as the Company experienced lower loan defaults during the first quarter of 2010 with net loan charge-offs declining from $6,437 in the fourth quarter of 2009 to $3,883 during the first quarter 2010. The Company's allowance for loan losses increased slightly to $50,167 at March 31, 2010 from $50,161 at December 31, 2009 and the reserve to outstanding loans ratio increased to 2.52% from 2.45% at December 31, 2009 and 2.19% at March 31, 2009. Credit quality ratios had generally declined since September 30, 2007 through the second quarter of 2009, principally as a result of the prolonged deterioration of the residential real estate construction and development market, beginning in the fourth quarter of 2007, in the Company's urban markets,

primarily Nashville and Knoxville. Beginning late in the third quarter of 2009 the Company began to witness economic stabilization beginning to materialize in certain of its major markets with this trend continuing through the first quarter of 2010. Management continually evaluates the Company's credit policies and procedures for effective risk and control management. The ratio of allowance for loan losses to nonperforming loans was 78.85%, 66.39% and 45.16% at March 31, 2010, December 31, 2009 and March 31, 2009, respectively, and the ratio of nonperforming assets to total assets was 5.27%, 5.07% and 4.34% at March 31, 2010, December 31, 2009 and March 31, 2009, respectively. The ratio of nonperforming loans to total loans, net of unearned interest, was 3.19%, 3.70% and 4.84% at March 31, 2010, December 31, 2009 and March 31, 2009, respectively. Within the Bank, the Company's largest subsidiary, the ratio of nonperforming assets to total assets was 5.25%, 5.04% and 4.31% at March 31, 2010, December 31, 2009 and March 31, 2009, respectively.

Based on management's calculation, an allowance of $50,167, or 2.52% of total loans, net of unearned income, was an adequate estimate of losses inherent in the loan portfolio as of March 31, 2010. This estimate resulted in a provision for loan losses in the income statement of $3,889 for the three months ended March 31, 2010. If the economic conditions, loan mix and amount of future charge-off percentages differ significantly from those assumptions used by management in making its determination, the allowance for loan losses and provision for loan losses on the income statement could be materially affected.

The Company's year-to-date net charge-offs as a percentage of average loans increased from 0.03% (annualized 0.12%) for the three months ended March 31, 2009 to 0.19% (annualized 0.76%) for the three months ended March 31, 2010. Net charge-offs as a percentage of average loans were 2.25% for the year ended December 31, 2009.

Management believes that credit quality indicators will be driven by the current economic environment and the resiliency of residential real estate markets. Management continually evaluates the existing portfolio in light of loan concentrations, current general economic conditions and economic trends. Based on its evaluation of the allowance for loan loss calculation and review of the loan portfolio, management believes the allowance for loan losses is adequate at March 31, 2010. However, the provision for loan losses could further increase for the entire year of 2010 if the general economic conditions continue to weaken or the residential real estate markets in Nashville, Knoxville or the Company's other markets or the financial conditions of borrowers deteriorate beyond management's current expectations.

26.     On July 21, 2010, the Company issued a press release entitled, "Green Bankshares

Reports Second Quarter Net Income of $1,561,000 or $0.12 Per Diluted Share." Therein, the

Company, in relevant part, stated:

> GREENEVILLE, Tenn.--(BUSINESS WIRE)-- Green Bankshares, Inc. (NASDAQ:GRNB), the holding company for GreenBank, today reported net income available to common shareholders of $1,561,000 for the second quarter of 2010 compared with net income available to common shareholders of $1,946,000 for the first quarter of 2010 and a net loss available to common shareholders of $151,400,000 for the second quarter of 2009. The net loss for the second quarter of 2009 primarily reflected a non-cash, one-time goodwill impairment charge totaling $143,389,000; excluding this impairment charge, the net operating loss for the year-earlier quarter was $13,986,000 (please refer to the non-GAAP measurement reconciliation on page 5). For the six months ended June 30, 2010, net income available to common shareholders totaled $3,507,000 compared with a net loss available to common shareholders of $10,438,000 for the same period a year ago after excluding the onetime, non-cash, after-tax goodwill impairment charge of $137,414,000.

> On a diluted per share basis, net income available to common shareholders totaled $0.12 for the second quarter of 2010 and $0.15 for the first quarter of 2010 compared with a net loss available to common shareholders of $1.07 after excluding the impact of the non-cash after-tax goodwill impairment charge of $10.51 for the second quarter of 2009. On a year-to-date basis, diluted per share net income available to common shareholders totaled $0.27 compared with a net loss available to common shareholders of $0.80 per diluted share for the first six months of 2009 after excluding the impact of the non-cash, after-tax goodwill impairment charge of $10.52.

> Excluding preferred stock dividends paid to the U.S. Treasury and the accretion of discount on common stock warrants issued to the U.S. Treasury, the Company reported net income of $2,811,000 for the second quarter of 2010 and $6,007,000 for the six months ended June 30, 2010, compared with a net loss of $150,150,000 and $145,370,000, respectively, for the comparable periods in 2009.

> \*      \*      \*

> Stephen M. Rownd, Chairman and Chief Executive Officer, commented, "While the outlook for economic recovery remains uncertain, we have taken a number of strategic steps that include the continued reduction in our construction and development portfolios, as indicated in the foregoing loan migration table, coupled with accelerated problem asset resolution through the segregation of staffing in our special assets area and by transferring additional resources into this area. At June 30,

2010, our loan loss reserves to total loans was 2.60% and our loan loss reserves were approximately 2.8 times annualized net charge-offs. Our non-performing asset and charge-off levels may remain elevated over the next few quarters based on trends in general economic conditions and as we realize the results of our strategic actions."

*       *       *

Non-interest income totaled approximately $8.8 million during the second quarter of 2010, rising 14% on a linked quarter basis and up 29% compared with the second quarter of 2009. During the second quarter of 2010 and 2009, the Company reported net Other-Than-Temporary Impairment (OTTI) charges taken on securities of $93,000 and $733,000, respectively. For the first six months of 2010, non-interest income, including OTTI charges, totaled almost $16.4 million compared with $13.8 million for the same period a year ago, an increase of 20%. Excluding year-to-date OTTI charges of $93,000 in 2010 and $733,000 in 2009, non-interest income improved 14% in the first six months of 2010. The principal contributors to both the quarterly and year-to-date improvements in non-interest income were higher service charge revenues on deposits together with increased annuity sales activity. The ongoing success of GreenBank's High Performance Checking product added 3,562 net new checking account customers during the second quarter of 2010 for a new account opening ratio of 2.02 new accounts opened for each account closed.

Non-interest expenses totaled approximately $21.3 million for the second quarter of 2010, increasing less than 4% from the first quarter of 2010. Excluding the one-time, non-cash, goodwill impairment charge of $143.4 million recorded during the second quarter of 2009, non-interest expenses declined 15% from the year-earlier quarter. Driving the second quarter 2010 increase in non-interest expenses were normal non-executive compensation increases along with annuity sales commissions; higher advertising costs associated with a proactive program implemented to solicit customers to participate in the "opt-in" provisions of the Bank's overdraft program; higher FDIC insurance expenses and increased losses on the disposition of OREO-related properties.

27.     On August 6, 2010, Green filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal second quarter. The Company's Form 10-Q was signed by Defendant Adams and reaffirmed the Company's financial results previously announced on July 21, 2010. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants Rownd and Adams, substantially similar to the certifications contained in ¶21, *supra*.

28.     The Company's Form 10-Q filed with the SEC on August 6, 2010, in relevant part,

stated:

**Provision for Loan Losses**. During the three and six months ended June 30, 2010, loan charge-offs were $5,316 and $10,049, respectively, and recoveries of charged-off loans were $448 and $1,299. The Company's provision for loan losses decreased by $19,635 to $4,749 for the three months ended June 30, 2010, as compared to $24,384 for the same period in 2009. Compared with the first quarter of 2010, the provision for loan losses modestly increased $860 as the Company experienced an increase in loan defaults during the second quarter of 2010 with net loan charge-offs increasing from $3,883 in the first quarter of 2010 to $4,867 during the second quarter of 2010. The Company's allowance for loan losses decreased slightly to $50,049 at June 30, 2010 from $50,167 at March 31, 2010 while the reserve to outstanding loans ratio increased to 2.60% from 2.52% at March 31, 2010 and 2.30% at June 30, 2009. Credit quality ratios had generally declined since September 30, 2007 through the second quarter of 2009, principally as a result of the prolonged deterioration of the residential real estate construction and development market, beginning in the fourth quarter of 2007, in the Company's urban markets, primarily Nashville and Knoxville. Beginning late in the third quarter of 2009 the Company began to witness economic stabilization beginning to materialize in certain of its major markets with this trend continuing through the second quarter of 2010. Management continually evaluates the Company's credit policies and procedures for effective risk and control management. The ratio of allowance for loan losses to nonperforming loans was 77.02%, 78.85% and 52.96% at June 30, 2010, March 31, 2010 and June 30, 2009, respectively, and the ratio of nonperforming assets to total assets was 5.61%, 5.27% and 4.91% at June 30, 2010, March 31, 2010 and June 30, 2009, respectively. The ratio of nonperforming loans to total loans, net of unearned interest, was 3.37%, 3.19% and 4.34% at June 30, 2010, March 31, 2010 and June 30, 2009, respectively. Within the Bank, the Company's largest subsidiary, the ratio of nonperforming assets to total assets was 5.59%, 5.25% and 4.88% at June 30, 2010, March 31, 2010 and June 30, 2009, respectively.

Based on management's calculation, an allowance of $50,049, or 2.60% of total loans, net of unearned income, was an adequate estimate of losses inherent in the loan portfolio as of June 30, 2010. This estimate resulted in a provision for loan losses in the income statement of $4,749 for the three months ended June 30, 2010. If the economic conditions, loan mix and amount of future charge-off percentages differ significantly from those assumptions used by management in making its determination, the allowance for loan losses and provision for loan losses on the income statement could be materially affected.

The Company's year-to-date net charge-offs as a percentage of average loans decreased from 1.08% (annualized 2.16%) for the three months ended June 30, 2009

to 0.44% (annualized 0.88%) for the three months ended June 30, 2010. Net charge-offs as a percentage of average loans were 2.25% for the year ended December 31, 2009.

Management believes that credit quality indicators will be driven by the current economic environment and the resiliency of residential real estate markets. Management continually evaluates the existing portfolio in light of loan concentrations, current general economic conditions and economic trends. During the second quarter of 2010, the Company segregated the staffing in its special assets area and transferred additional independent resources into this area to accelerate problem asset resolution.

Based on its evaluation of the allowance for loan loss calculation and review of the loan portfolio, management believes the allowance for loan losses is adequate at June 30, 2010. However, the provision for loan losses could further increase for the entire year of 2010 based on actions taken by the special assets area to resolve problem loans, and if the general economic conditions continue to weaken or the residential real estate markets in Nashville, Knoxville or the Company's other markets or the financial conditions of borrowers deteriorate beyond management's current expectations.

*       *       *

Impaired loans, which are loans identified as being probable that the Company will be unable to collect all amounts of contractual interest and principal as scheduled in the loan agreement, totaled $124,318 at June 30, 2010 compared with $103,479 at March 31, 2010 and $109,501 at December 31, 2009. At June 30, 2010, the Company classified a relationship totaling approximately $20,122 as impaired. The loan is current and the guarantors appear to have the necessary resources to continue to maintain the current status of this credit.

29.    The statements contained in ¶¶20-28 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was overvaluing the collateral of certain loans above appropriate market values; (2) that, as such, the Company was failing to timely take impairment charges to reduce the carrying values of certain loans to the appropriate market values; (3) that the Company lacked adequate internal and financial controls; and (4) that, as such, the Company's financial results were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

30.     On August 20, 2010, the Company issued a press release entitled, "Green Bankshares

Reports Net Loss for the Third Quarter of 2010."  Therein, the Company, in relevant part, stated:

> GREENEVILLE, Tenn. (October 20, 2010) – Green Bankshares, Inc.
> (NASDAQ:GRNB), the holding company for GreenBank, today reported a net loss
> available to common shareholders of $36.4 million or $2.78 per diluted share for the
> third quarter of 2010 compared with a net  loss available to common shareholders of
> $7.7 million or $0.59 per diluted share for the year-earlier quarter.  The third quarter
> of 2010 reflected higher costs related to loan charge-offs, coupled with losses
> incurred on Other Real Estate Owned (OREO) resulting from sales completed and
> updated property appraisals received.  For the first nine months of 2010, net loss
> available to common shareholders was $32.9 million or $2.51 per diluted share
> compared with $155.6 million or $11.91 per diluted share for the first nine months
> of 2009.
>
> Commenting on the announcement, Stephen M. Rownd, Chairman and Chief
> Executive Officer, said, "For the most part, the credit and impairment charges
> incurred during the third quarter resulted principally from a handful of events that
> occurred in the second half of the quarter.  We continue to aggressively focus on
> dealing with our problem assets through our Special Assets Group and, depending
> upon economic conditions, envision the possibility of further credit challenges
> through the remainder of 2010. While credit quality remains a major obstacle, the
> core performance of our company is improving. Our net interest margin, excluding
> interest reversals, continues to expand, and non-interest income is also growing with
> our increasing core deposit base.  Despite the challenging environment and the losses
> we incurred this quarter, our regulatory capital ratios remain quite strong."
>
> *     *     *
>
> As the economy remained stubbornly sluggish during the third quarter of 2010,
> highlighted by the lack of meaningful improvement in employment statistics and the
> residential real estate construction and development environment in the Company's
> markets, ***a number of the Bank's borrowers experienced further stress, prompting
> the Company to engage an independent third-party loan reviewer.  This review
> contributed to the asset quality-impact reflected in our third quarter results.***
>
> *     *     *
>
> "Efforts to reduce our commercial real estate exposure continued through the third
> quarter," Rownd continued.  "Since the third quarter of 2009, we have reduced our
> overall exposure to commercial real estate by more than 18%.  Over the last year, the
> higher risk concentrations in the speculative 1-4 family residential real estate
> portfolio have declined almost 32% and construction and development loans have
> declined by more than 39%, as indicated in the foregoing loan portfolio migration
> table. Accelerating our problem asset resolution remains our top priority through the

focused efforts of our Special Assets Group. We continue to seek to resolve these issues in the best interests of our shareholders, with a goal of returning to profitability in 2011. Depending on general economic conditions, our non-performing asset and charge-off levels may remain elevated over the next few quarters as we realize the results of our strategic actions." Rownd also noted that the Company's loan loss reserve to total loans was 2.74% at September 30, 2010.

(Emphasis added).

31.     On this news, shares of GRNB declined $2.79 per share, more than 43%, to close on October 21, 2010, at $3.68 per share, on unusually heavy volume.

32.     The statements contained in ¶30 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was overvaluing the collateral of certain loans above appropriate market values; (2) that, as such, the Company was failing to timely take impairment charges to reduce the carrying values of certain loans to the appropriate market values; (3) that the Company lacked adequate internal and financial controls; and (4) that, as such, the Company's financial results were materially false and misleading at all relevant times.

33.     On November 9, 2010, after the market closed, GRNB issued a press release entitled, "Green Bankshares Defers TARP Dividends and Trust Preferred Interest Payments." Therein, the Company, in relevant part, stated:

GREENEVILLE, Tenn.--(BUSINESS WIRE)-- Green Bankshares, Inc. (NASDAQ:GRNB), the holding company for GreenBank, today announced that it has given notice to the U.S. Treasury Department that the Company is suspending the payment of regular quarterly cash dividends on the Company's Fixed Rate Cumulative Perpetual Preferred Stock, Series A, issued to the U.S. Treasury Department. Deferral of these dividends for six periods would trigger board appointment rights for the holder of the Series A Preferred Stock. The dividends will continue to be accrued for payment in the future and will be reported for the duration of the deferral period as a preferred dividend requirement that is deducted from income available to common shareholders for financial statement purposes.

Additionally the Company has also exercised its rights to defer regularly scheduled interest payments on all of its issues of junior subordinated debentures, relating to outstanding trust preferred securities (TRUPs), having an outstanding principal amount of $88.6 million. Under the terms of the trust documents, the Company may defer payments of interest for up to 20 consecutive quarterly periods without default or penalty. The regularly scheduled interest payments will continue to be accrued for payment in the future and reported as an expense for financial statement purposes.

Together, the deferral of interest payments on TRUPs and suspension of dividend payments to the U.S. Treasury Department should preserve about $5.1 million per year in bank level capital.

The Company made the decision to suspend these payments in consultation with the Federal Reserve Bank of Atlanta.

34.     On November 9, 2010, after the market closed, GRNB filed its Quarterly Report on Form 10-Q with the SEC for the 2010 third fiscal quarter, which was signed by Defendant Adams and reaffirmed the Company's financial results previously announced on April 21, 2010.  Therein, the Company, in relevant part, stated:

> . . . The net loss available to common shareholders was $36,405 for the third quarter of 2010 compared with net income available to common shareholders of $1,561 during the second quarter of 2010 and net income available to common shareholders of $1,946 for the first quarter of 2010. ***The principal reason for the decline from profitability in the second and first quarters of 2010 relative to a net loss available to common shareholders for the third quarter of 2010 was an increase in net loan charge-offs. The Company experienced two large credit defaults late in the third quarter of 2010 resulting in approximately $20.7 million in loan impairment charges and write-downs. These two events coupled with the weakening in new home sales during the third quarter of 2010, exacerbated by the elimination of the first-time home buyer's tax credit during the second quarter of 2010, further strained the borrowers' ability to move excess inventory. As a result, collateral dependent loans were again re-evaluated and impairment charges were taken to reduce carrying values to appropriate market values less estimated costs to dispose of these properties.***

*     *     *

> **Provision for Loan Losses.** During the three and nine month periods ended September 30, 2010, loan charge-offs were $37,199 and $47,248, respectively, and recoveries of charged-off loans were $650 and $1,949, respectively. Loan charge-offs

were $19,224 and $47,591, respectively, for the three and nine months ended September 30, 2009. Recoveries of charged-off loans were $788 and $5,132, respectively, during these same periods. The Company's provision for loan losses increased to $36,823 for the three months ended September 30, 2010, compared to $18,475 for the same period in 2009. Compared with the second quarter of 2010, the provision for loan losses rose by $32,074 as the Company experienced an increase in loan defaults during the third quarter of 2010. ***Contributing to a significant portion of the deterioration in the loan portfolio during the quarter ended September 30, 2010 were two large relationships totaling approximately $31.4 million, after charge-offs of $20.7 million, which defaulted during the latter part of the third quarter. These borrowers had been paying interest only and were current but new appraisals ordered during the quarter showed collateral shortfalls that caused the Company to move these relationships to non-accrual and charge them down to the collateral values.*** The Company's allowance for loan losses increased slightly to $50,322 at September 30, 2010 from $50,049 at June 30, 2010 while the reserve to outstanding loans ratio increased to 2.74% from 2.60% at June 30, 2010 and 2.39% at September 30, 2009. Credit quality ratios have generally declined since September 30, 2007 principally as a result of the prolonged recession and continued deterioration of the residential real estate construction and development portfolios in the Company's urban markets, primarily Nashville and Knoxville. ***During the third quarter of 2010 as a number of the Company's borrowers, including certain larger credit relationships, continued to experience additional economic stress and economic conditions remained sluggish, highlighted by a lack of meaningful improvement in employment statistics and the residential real estate and construction development environment, management contracted with an independent third party loan review company to evaluate certain aspects of the Company's loan portfolio. As a result of this review and continued economic deterioration occurring during the third quarter of 2010 coupled with normal updated borrower financial information received during the quarter, higher loan charge-offs and impairment charges were deemed appropriate given the changing environment.*** The ratio of allowance for loan losses to nonperforming loans was 40.76%, 77.02% and 73.09% at September 30, 2010, June 30, 2010 and September 30, 2009, respectively, and the ratio of nonperforming assets to total assets was 8.16%, 5.61% and 4.48% at September 30, 2010, June 30, 2010 and September 30, 2009, respectively. The ratio of nonperforming loans to total loans, net of unearned interest, was 6.73%, 3.37% and 3.27% at September 30, 2010, June 30, 2010 and September 30, 2009, respectively. Within the Bank, the Company's largest subsidiary, the ratio of nonperforming assets to total assets was 8.13%, 5.59% and 4.43% at September 30, 2010, June 30, 2010 and September 30, 2009, respectively.

Based on management's calculation, an allowance of $50,322, or 2.74% of loans, net of unearned income, was an adequate estimate of losses inherent in the loan portfolio as of September 30, 2010. This estimate resulted in a provision for loan losses in the

income statement of $36,823 for the three months ended September 30, 2010. If the economic conditions, loan mix and amount of future charge-off percentages differ significantly from those assumptions used by management in making its determination, the allowance for loan losses and provision for loan losses on the income statement could be materially affected.

The Company's year-to-date net charge-offs as a percentage of average loans increased from 1.93% for the three months ended September 30, 2009 to 2.31% (annualized 3.08%) for the three months ended September 30, 2010. Net charge-offs as a percentage of average loans were 2.25% for the year ended December 31, 2009.

Management believes that credit quality indicators will be driven by the current economic environment and condition of the residential real estate markets. Management continually evaluates the existing portfolio in light of loan concentrations, current general economic conditions and economic trends. During the second quarter of 2010, the Company segregated staffing for its special assets group and transferred additional independent resources into this area in an effort to accelerate problem asset resolution.

Based on its evaluation of the allowance for loan loss calculation and review of the loan portfolio, management believes the allowance for loan losses is adequate at September 30, 2010. However, the provision for loan losses could further increase for the entire year 2010 based on actions taken by the special assets group to resolve problem loans, and if general economic conditions remain sluggish or weaken further or the residential real estate markets in Nashville, Knoxville or the Company's other markets or the financial conditions of borrowers deteriorate beyond management's current expectations.

*        *        *

Non-performing assets ("NPA's"), which include non-accrual loans, loans past due 90 days or more and still accruing interest and OREO, totaled $197,159 at September 30, 2010 compared with $141,915 at June 30, 2010. ***During the three month period ended September 30, 2010, the Company experienced an increase in net NPA's of $55,244 as the Company continued to identify and recognize NPA's through the efforts of the special assets group and the results of the independent third-party loan review conducted during the third quarter of 2010.*** The Company expects that the levels of NPA's will remain elevated through the remainder of the year and into 2011.

Non-performing loans include non-accrual loans and loans 90 or more days past due. All loans that are greater than 90 days past due are considered non-accrual unless they are adequately secured and there is reasonable assurance of full collection of principal and interest. Non-accrual loans that are 120 days past due without assurance

of repayment are charged off against the allowance for loan losses. ***Nonaccrual loans and loans past due 90 days totaled $123,460 at September 30, 2010, an increase of $58,477 from June 30, 2010 principally as a result of two large loans totaling $31.4 million, after charge-offs, added to non-accrual status during the quarter.***

(Emphasis added).

35.     On this news, shares of Green declined $1.08 per share, approximately 30%, to close on November 10, 2010, at $2.57 per share, on unusually heavy volume.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Green's securities between January 19, 2010 and November 9, 2010, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Green's securities were actively traded on the National Association of Securities Dealers Automated Quotations Systems ("NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Green shares were traded publicly during the Class Period on the NASDAQ and as of November 9, 2010, Green had 13,190,300 shares of the Company's common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Green or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Green; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

42.     The market for Green's securities was open, well-developed and efficient at all

relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Green's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Green's securities relying upon the integrity of the market price of the Company's securities and market information relating to Green, and have been damaged thereby.

43. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Green's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Green's business, operations, and prospects as alleged herein.

44. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Green's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

45.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.     During the Class Period, Plaintiff and the Class purchased Green's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors's losses.

## SCIENTER ALLEGATIONS

47.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Green, his/her control over, and/or receipt and/or modification of Green's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Green, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

48.     The market for Green's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to

disclose, Green's securities traded at artificially inflated prices during the Class Period.  On May, 12, 2010, the Company's stock closed at a Class Period high of $14.77 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Green's securities and market information relating to Green, and have been damaged thereby.

49.     During the Class Period, the artificial inflation of Green's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Green's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Green and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

50.     At all relevant times, the market for Green's securities was an efficient market for the following reasons, among others:

(a)     Green stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Green filed periodic public reports with the SEC and the NASDAQ;

(c)     Green regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and;

(d)     Green was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

51.     As a result of the foregoing, the market for Green's securities promptly digested current information regarding Green from all publicly available sources and reflected such information in Green's stock price. Under these circumstances, all purchasers of Green's securities during the Class Period suffered similar injury through their purchase of Green's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

52.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Green who knew that the statement was false when made.

### FIRST CLAIM
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

53. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Green's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

55. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Green's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Green's financial well-being and prospects, as specified herein.

57. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Green's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Green and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

58. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and

sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

59.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Green's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Green's securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Green's securities during the

Class Period at artificially high prices and were damaged thereby.

61.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's business, operations, and prospects, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Green securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of Green within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company,

including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Green and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: November 17, 2010

Respectfully submitted,
By:

s/*Paul Kent Bramlett*
PAUL KENT BRAMLETT #7387
**BRAMLETT LAW OFFICES**
2400 Crestmoor Road
P. O. Box 150734
Nashville, TN 37215
Telephone:     (615) 248-2828
Facsimile:      (866) 816-4116
                      (615) 254-4116
E-mail: PKNASHLAW@aol.com
              pk@BramlettLawOffices.com

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:      (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone:     (215) 638-4847
Facsimile:      (215) 638-4867

*Attorneys for Plaintiff Bill Burgraff*